**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **v.**                                                        **1:17-CR-403 (NAM)**

**JOHN G. STROMING,**

                    **Defendant.**
_____

**APPEARANCES:**

For United States of America:
Grant C. Jaquith
United States Attorney
Joseph A. Giovannetti
Assistant United States Attorney
Office of the United States Attorney
445 Broadway, Room 218
Albany, New York 12207

Lisa A. Peebles, Federal Public Defender
Gene V. Primomo, Esq.
Assistant Federal Public Defender
Office of the Federal Public Defender
39 North Pearl Street, 5th Floor
Albany, New York 12207
Attorney for Defendant

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

      Defendant John G. Stroming is charged with one count of Sexual Exploitation of a

Child, in violation of 18 U.S.C. § 2251(a) and (e), and one count of Possession of Child

Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).  (Dkt. No. 1).  It is further

charged that Defendant committed these offenses after he had a prior conviction relating to child

pornography and thus is subject to the enhanced penalty provisions in 18 U.S.C. §§ 2251(e) and 2252A(b)(2).  (*Id.*).  On April 6, 2018, Defendant filed a pre-trial motion seeking to suppress statements he made in an interview conducted by law enforcement on April 24, 2017, while he was incarcerated.  (Dkt. No. 10).  The Government opposes the motion.  (Dkt. No. 13).  An evidentiary hearing was held on May 8, 2018, after which the parties were permitted to submit proposed findings of fact and conclusions of law.  (Dkt. Nos. 20, 23–24).  As explained below, based on the facts from the evidentiary hearing and the parties' submissions, Defendant's motion to suppress is denied.

## II.    BACKGROUND

This case begins in 2010, when Defendant was the subject of an investigation by the New York State Police Internet Crimes Against Children Task Force related to the online solicitation of underage girls for the purpose of producing child pornography.  (Dkt. No. 20, Hearing Transcript, 70, 72–73).  Investigators Jeffrey Goldman and Eric Barnes were part of that Task Force.  (Tr. 72).  In August 2010, they executed a search warrant at Defendant's residence and seized electronic media that contained child pornography.  (Tr. 73).  The investigators located Defendant and learned that he had been engaged in a sexual relationship with a 13 year-old girl.  (Dkt. No. 13, p. 2).  Defendant was fifty-one years old at the time.  (*Id.*). Defendant pleaded guilty to multiple counts of Rape in the Second Degree and Criminal Sex Act in the Second Degree; he was sentenced to 20 years imprisonment.  (*Id.*, p. 3).

While the state case was pending, two of Defendant's nieces reported to police that they found a videotape at his residence, which depicted an "adult male placing his penis into the rectum of a young child."  (Dkt. No. 10-1, p. 2).  Although the adult male's face never appears in the video, investigators "identified a distinctive mole halfway down the left side of his penis

that is clearly visible in the video." (Dkt. No. 13, p. 3). Based on this evidence, the U.S. Attorney's Office in the N.D.N.Y. began investigating Defendant for sexually exploiting a child. (*Id.*). With Defendant in prison for the state convictions, the federal case lay dormant until investigators sought a search warrant in 2017, authorizing them to photograph Defendant's genitals for the purpose of positively identifying him as the adult male in the video. (*Id.*, p. 4).

To facilitate the search, on or around March 31, 2017, Defendant was transferred from Sullivan Correctional Facility to Great Meadow Correctional Facility to obtain jurisdiction in the N.D.N.Y. (Tr. 8–10). Once at Great Meadow, Defendant was placed in the medical ward because he suffers from a hearing disability that could not be accommodated in general population. (Tr. 10–11, 16, 31–32). While in the medical ward, Defendant had access to a recreation room, a telephone, and standard visitation; he did not have access to the commissary. (Tr. 23, 32–33, 53).

On April 12, 2017, investigators obtained a warrant to photograph Defendant's unclothed body, including his genitals, in "a reasonably private location." (Tr. 41, 44, 79; Dkt. No. 13-1). On April 24, 2017, State Police investigators Goldman, Barnes, and Timothy Ayers went to Great Meadow to execute the warrant. (Tr. 79). The three investigators were not in uniform and did not bring their firearms into the prison. (Tr. 37, 80, 83–84, 101). They were met by Christopher Martuscello, Deputy Chief of the DOCCS Office of Special Investigations, who escorted them to an examination room within the medical wing. (Tr. 37–38). The exam room "had a metal door with a glass window in it," and "a [barred] window in the room facing a courtyard." (Tr. 38). The room was described as typical of a medical exam room outside of a prison facility, ten by twelve feet in size, with a sink, a chair, and various medical instruments.

(Tr. 38–39, 81, 104).  At approximately 10:30 a.m., Defendant was brought to the medical exam room by two corrections officers, in accordance with DOCCS policy.  (Tr. 43–44, 82).

Martuscello met Defendant at the door to the exam room, while Goldman, Barnes, and Ayers waited inside.  (Tr. 44).  Martuscello then explained to Defendant that State Police were at the prison to execute a federal warrant to photograph Defendant's genitals, and that the warrant authorized the use of force to secure those photographs.  (Tr. 44).  Defendant replied that he was willing to comply.  (Tr. 44).  A team was on standby in the event force was needed, but they were not activated.  (Tr. 46).  Martuscello did not specifically explain to Defendant that "complying with this search warrant didn't mean he had to speak to the agents."  (Tr. 65–66).

Martuscello testified that Defendant wanted to return to Sullivan Correctional Facility and asked "when he was getting out of" Great Meadow.  (Tr. 45).  Martuscello responded that "[a]s soon as this is over we can talk about where you're going next."  (Tr. 45).  Martuscello did not tell Defendant that State Police would have any say in where he was housed.  (Tr. 45).  Martuscello described the tone and demeanor of both himself and Defendant as calm.  (Tr. 45).

Martuscello then opened the door to the exam room, allowed Defendant inside, and Martuscello remained outside.  (Tr. 46).  Defendant was brought in without handcuffs or any other type of restraint, and was not restrained at any time.  (Tr. 43, 82, 105).  Defendant sat in a chair throughout the interview while Goldman, Barnes, and Ayers stood five or six feet away.  (Tr. 84).  The three investigators were the only people other than Defendant present in the room.  (Tr. 96).  *Miranda* warnings were not read to Defendant before or during the interview, which lasted about 10 minutes.  (Tr. 86).  Defendant was also not told that he had to answer the investigators' questions.  (Tr. 88).

Goldman first asked if Defendant recognized him from Defendant's prior arrest, which he eventually did.  (Tr. 83).  Goldman explained they were there to investigate a video that showed an adult male sexually abusing a male child.  (Tr. 84).  Defendant responded that the last time he spoke with Goldman, he "ended up" in prison.  (Tr. 84–85).  Goldman replied that if Defendant was not the one who abused the child, they needed to find the right person to give the family "closure."  (Tr. 85).  Defendant then admitted that he was the adult male in the video. (Tr. 85).  Defendant also stated that he remembered the small handheld camera that he had used, and that the incident had occurred at his friend's house.  (Tr. 85).  He denied that the child was male and insisted that he was not a homosexual.  (Tr. 85).  The tone and demeanor of the investigators and the Defendant during the interview was calm, professional, and conversational, although Ayers noted that Defendant seemed a little "annoyed" because he did not know why he had been transferred to Great Meadow.  (Tr. 83–84, 106).

After the interview, Defendant was shown a copy of the search warrant, and he posed for a total of 24 photographs, including pictures of his genitals.  (Tr. 106–07, 110, 112).  There was no further questioning during the execution of the warrant.  (Tr. 87–88).  Defendant was then led out of the room, ending the interview and search, which lasted approximately 20 minutes total. (Tr. 47–48, 88, 109).  Neither the interview nor the search were recorded.  (Tr. 90).

## III.   DISCUSSION

Defendant moves to suppress evidence of his statements to law enforcement officials on the grounds that his statements were obtained in violation of his *Miranda* and Due Process rights.  (Dkt. No. 10-1, p. 5; Dkt. No. 23, pp. 4–11).  In response, the Government argues that Defendant was not in custody for purposes of *Miranda* and that his statements were voluntary. (Dkt. No. 13, p. 7; Dkt. No. 24, pp. 11–17).

To protect the Fifth Amendment right against self-incrimination, authorities may not interrogate a suspect who has been taken into custody without first providing the well-known *Miranda* warnings.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  "Pursuant to *Miranda*, the police must advise a defendant of his rights only if two preconditions are met: namely, custody and interrogation."  *United States v. Miller*, 382 F. Supp. 2d 350, 370 (N.D.N.Y. 2005) (citing *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)).  "Absent either, non-*Mirandized* statements are admissible."  *Id.*  Since Defendant has alleged custodial interrogation in the absence of *Miranda* warnings, the burden in this case shifts to the government to prove that "there was no custodial interrogation implicating *Miranda*."  *Id.* at 362.

For *Miranda* purposes, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).  However, "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*."  *Id.* at 511; *see also Georgison v. Donelli*, 588 F.3d 145, 157 (2d Cir. 2009) ("[T]he mere fact of incarceration does not necessarily require that an individual be in the sort of custody that warrants *Miranda* warnings before an interview.").  "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Howes*, 565 U.S. at 509 (alteration in original) (internal quotation marks and citation omitted).  In this analysis, "courts must examine all of the circumstances surrounding the interrogation," including but not limited to the location of questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.  *Id.* (internal quotation marks and citations omitted); *see also United States v. FNU*

*LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (relevant factors include interrogation's duration, its location, whether the suspect volunteered for the interview, whether the officers used restraints, whether weapons were present and especially whether they were drawn, and whether officers told the suspect he was free to leave or under suspicion).

In addition, courts must assess "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *see also Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (noting that the "freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody"); *Georgison*, 588 F.3d at 157 (concluding that the incarcerated individual was not in custody for *Miranda* purposes where "[t]here was no measure of compulsion above and beyond that inherent in custody itself," and there "was no coercive pressure that tended to undermine [his] will or compel him to speak") (quotation marks and citation omitted).  Thus, "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted."  *Howes*, 565 U.S. at 514.

Defendant argues that "the primary reason for why John Stroming needed to be *Mirandized* is due to the psychological pressure he endured before even entering the interrogation room."  (Dkt. No. 23, p. 6).  Defendant emphasizes two facts on this point: 1) prior to meeting with investigators, he was told that if he did not comply with the search warrant, prison security staff would use force to execute the search warrant; and 2) he was never told that he did not have to answer any questions as part of complying with the search warrant.  (*Id.*).  Thus, Defendant suggests that he "entered the interrogation room with only the understanding that if he did not comply, physical force would be used against him."  (*Id.*).

7

First, Defendant did not testify or submit any evidence as to his understanding prior to or during the interview.[1]  Second, the evidence shows that Plaintiff was specifically told that force was authorized to execute the search warrant.  Martuscello explained to Defendant that the use of force was limited to fulfilling "a federal warrant to photograph his private parts."  (Tr. 44).  There was no mention of the use of force to compel answers to questions during the interview.  (*Id.*).  Defendant had no interaction with the team that had been prepared to use force to ensure his compliance.  (Tr. 46).  Third, Martuscello was not in the exam room during the interview.  Thus, the potential use of force to execute the search warrant was not explicitly or implicitly linked to *the separate interview*, and it did not transform the interview into a custodial situation.

Defendant also argues that his transfer to Great Meadow and placement in a "locked, medical isolation unit where he had limited access to other prisoners" points toward an atmosphere similar to the coercive pressures of formal arrest.  (Dkt. No. 23, p. 6).  However, Defendant was transferred to Great Meadow more than three weeks before the interview, and he was placed in the medical unit as per prison procedure to accommodate his hearing disability.  (Tr. 10, 13, 15–16).  As to his living conditions, they were comparable to ordinary prison confinement; he had access to recreation, visitation, and the telephone.  (Tr. 8, 15, 20, 23–24, 30, 33, 67).

Next, Defendant argues that he did not have the option to terminate the interview because he "was obliged under the authority of the search warrant to remain in the room with the police investigators."  (Dkt. No. 23, p. 7).  There is no evidence that Defendant was advised that he was free to refuse to speak to the investigators, or that Defendant was told that he was

---

[1] Defendant initially alleged in his motion to suppress that he was threatened with a transfer to a different facility unless he cooperated with questioning.  (Dkt. No. 10-1, pp. 3–4).  However, Defendant did not submit an affidavit in support of his motion and he did not testify at the evidentiary hearing.  Further, these allegations were refuted at the hearing.  (Tr. 45, 62).  Therefore, the Court does not credit them.

free to leave. Clearly, he had to stay in the exam room for the execution of the search warrant. These factors weigh in Defendant's favor on the custody issue. *See Howes*, 565 U.S. at 515.

However, even assuming that a reasonable person in Defendant's position would have felt that he was not at liberty to leave the exam room until the search warrant was executed, there is no evidence that Defendant was subject to coercive pressure that tended to undermine his will or compel him to speak. Rather, the circumstances of the interview show a brief, calm exchange in a clinical setting. Defendant was not handcuffed or restrained before, during, or after the interview, which took place in a typical medical exam room, with an outside window. (Tr. 38–39, 43, 81–82, 104–05). The investigators did not physically threaten Defendant or use force in any way; they were not in uniform and did not have firearms. (Tr. 37, 80, 83–84, 101, 116). The interview took place during the late morning and lasted only ten minutes. (Tr. 86). Although corrections officers escorted Defendant to the exam room, "[e]scorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location." *Howes*, 565 U.S. at 513. Moreover, "[t]aking a prisoner aside for questioning—as opposed to questioning the prisoner in the presence of fellow inmates—does not necessarily convert a noncustodial situation . . . to one in which *Miranda* applies." *Id.* at 512 (quotation marks and citation omitted).

As to the statements made during the interview, the evidence shows that after investigators introduced themselves to Defendant and informed him about the case and the search warrant, he admitted that he was the man in the video. (Tr. 84–85). Defendant briefly hesitated, but the investigators did not affirmatively convey to Defendant that he had to answer their questions or otherwise pressure him. (*Id.*). Although the investigators told Defendant that they had to photograph him and identify the man in the video, the accusatory nature of the

interview was not necessarily enough to create a custodial situation.[2]  *See Howes*, 565 U.S. at

513; *Georgison*, 588 F.3d at 149.  The investigators used a calm and conversational tone

throughout the interview, and Defendant did likewise.  (Tr. 45, 83–84, 106).  Moreover,

Defendant never asked for a lawyer or to terminate the interview.

  Accordingly, considering all of the circumstances and the features of the interview,

particularly the location, duration, and lack of coercive pressure, Defendant was not in custody

for purposes of *Miranda*.  *See Howes*, 565 U.S. at 517 (incarcerated defendant not taken into

custody where he was interviewed for more than five hours in a prison conference room);

*Georgison*, 588 F.3d at 157; *see also United States v. Ellison*, 632 F.3d 727, 731 (1st Cir. 2010)

(affirming district court's finding that the incarcerated defendant was not in custody for *Miranda*

purposes); *United States v. Zygmont*, No. 5:12–CR–152, 2013 WL 3246139, at *7, 2013 U.S.

Dist. LEXIS 91506, at *19 (D. Vt. June 26, 2013) (concluding that the incarcerated defendant

was not in *Miranda* custody); *United States v. Muto*, No. 05-CR-344A, 2009 WL 5150233, at

*8, 2009 U.S. Dist. LEXIS 80478, at *17 (W.D.N.Y. Sept. 4, 2009) (finding that incarcerated

defendant "was not in an additional coercive situation so as to require being advised of full

*Miranda* rights") (emphasis omitted) *report and recommendation adopted*, No. 05-CR-344A,

2009 WL 4884468, 2009 U.S. Dist. LEXIS 115576 (W.D.N.Y. Dec. 10, 2009).

  Finally, Defendant's argument this his statements were made involuntarily is unavailing

for many of the same reasons.  A confession is only involuntary if it is "obtained under

circumstances that overbear the defendant's will at the time it is given."  *United States v.*

*Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).  The inquiry into a confession's voluntariness should

---

[2] Defendant also urges the Court to consider the "investigative intent" of the officers in evaluating the
*Miranda* custody issue.  (Dkt. No. 10-1, pp. 8–10; Dkt. No. 23, p. 5).  However, the subjective intent of
the investigators is irrelevant to the objective *Miranda* test.  *See FNU LNU*, 653 F.3d at 152 n.7 (citing
*Stansbury v. California*, 511 U.S. 318, 319 (1994)).

contemplate "the totality of all the surrounding circumstances." *United States v. Taylor*, 745 F.3d 15, 23–24 (2d Cir. 2014). Factors for the Court to consider in the totality of the circumstances inquiry include: (1) "the characteristics of the accused"; (2) "the conditions of interrogation"; and (3) "the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010).

Here, all three factors show that Defendant's statements were made voluntarily. Defendant is an adult and approximately sixty years of age. (Dkt. No. 13, p. 2). There is no evidence that he lacks intelligence or maturity. He has a significant criminal history and has been *Mirandized* before. (Tr. 77, 83). The conditions of the interview also support voluntariness, as discussed above regarding the custody issue. In addition, there is no evidence that any threats or promises were made to elicit Defendant's statements. While Defendant was told that he could be subjected to force to execute the search warrant, there was no mention of force in connection with the interview. (Tr. 44). Nor did anyone threaten or promise transfer to a particular facility. (Tr. 45). Accordingly, based on the totality of the circumstances, Defendant's statements were made voluntarily. *See United States v. Haak*, 884 F.3d 400, 414–16 (2d Cir. 2018) (statements voluntary where the totality of circumstances did not demonstrate that the defendant's will was overborne by police conduct); *United States v. Siddiqui*, 699 F.3d 690, 706–08 (2d Cir. 2012) (statements voluntary where the "agents' conduct was not overbearing or abusive" and the hospitalized defendant "was lucid and able to engage the agents in coherent conversation").

## IV.   CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion to suppress (Dkt. No. 10) is **DENIED**, and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

Date:   July 10, 2018
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge